May it please the Court, Donna Bader representing the appellant. All day, or as much of the day as we have so far, I've been so comfortable because I thought I was number two on the calendar and I could sit back and relax. And then I'm told I'm number one, so I'm not quite settled in. But this is also my first argument in front of the Ninth Circuit. Well, we welcome you and we hope it's not too unpleasant. I guess there's a little begging in there. Be kind to me. But I did submit a letter brief referring to a case called Schoenfeld v. Quam. Did the Court receive that? Yes, we did. Thank you. So I don't need to discuss the facts of that case. I just wanted to point out, as I looked at the cases, the Ninth Circuit seems to pay a lot of attention to what it calls the Johnson factors. And it's like a weighing process. This factor is in your favor, this one is against you. So I looked at those four factors and I felt I was in a pretty good position, actually, because the first factor, the place of the negligent act, was 20 miles from the base. It wasn't on the base. And it was a road that was also used by civilians. And as we know from the facts in the case, that there, in fact, were two cars ahead of, I guess it's Sergeant Maldonado's truck, that were civilian cars as well. Is there anywhere to go on that road other than the base? You know, I don't know. I know that it's accessible by people. I remember reading. There could be civilians on it, but they'd all be going to the base. There isn't anywhere else for them to be going. I read something in the file that said there were some residences out there. I'm not going to pretend that it was a scenic road and that people would go there to certainly not going to have a cup of coffee anywhere, but it was a civilian road. Now, the duty status of Geiger at the time, he wasn't under the compulsion of military orders. He was, in a way, because he had to complete his in-processing. He was under military orders to complete that within a period of time. And that's, in fact, what he was going to do. He was in uniform. He was on active duty. He was going to perform a military task once he got to Fort Irwin. Well, you know, that kind of brings us right to the fourth factor, his activities. I mean, we know he had three reasons that he talked about going there. But he conceded that he would have gone even if he weren't going to do the personal tasks, that regardless of anything else, he had to go and was going to go to do the in-processing. He could have chosen not to go. I thought he conceded that he would have gone that day anyway, even if his wife didn't have the interview and so forth. Yes, but he had the choice of saying, I don't feel like going. If I work hard, I have one more day of in-processing. I have three days to accomplish it. I don't feel like going. But he's saying, I probably would have gone. There's also some indication in the file that he said, if I had time. So the first reason that he's actually on the road at that particular time is to take his wife to the interview, which, of course, is a civilian activity. There's another aspect to this case that differentiates it from Schoenfeld that, to my mind, has some bearing on it. And I'd like your comment on that. And that is that the collision occurred with an Army vehicle driven by Army personnel. And in Schoenfeld, the accident occurred with a guardrail. And so in trying a case like this, where there would be questions potentially about was the Army person properly trained? Was the truck that belonged to the Army properly maintained? Those kind of issues that would necessarily implicate military things. Does that have a bearing on the outcome? Well, there's two points to be made about that. When you look at the accident, you have the Army truck going over into the opposite lane. It's on the wrong side. You don't have any fault factors by Geiger. And he's in violation of California law. I think it's pretty clear that this is an accident where either he's going too fast, there was some indication he was going about 70 miles per hour, and he swerved because a car ahead had stopped and pulled over. And he's in the wrong lane. I don't think you need to go to the maintenance of the truck. You don't need to go to his training. There was something about he locked his brakes, which I couldn't understand. Does that mean something that the driver did or perhaps some defect in the brakes in the anti-lock system or something like that? Well, I believe if he locked his brakes, it means he's braking pretty hard, but he's already in a skid or he's lost control. But there is no claim for a defective truck, no products liability. It's a simple negligence action. And under those circumstances, when you have someone in that other lane, you try the case. In my experience, you get a stipulation of liability and you go on damages because there just doesn't seem to be much question. You shouldn't be in that lane. And I don't think it requires any military secrets to get to that. And if we look at the ‑‑ It's not a matter of secrets. Doesn't our case law suggest that if you begin to inquire into military, even procedures, not necessarily what we would think of as state secrets, that that begins to implicate the exact interests that the Ferris Doctrine is designed to protect? I don't believe you need to make that inquiry. But let's look at it from ‑‑ and this is a perfect example. You have a serviceman suing, but you also have his wife suing who's a civilian. She's not in the case anymore. No. And the only issue on appeal, as I understand it, is his claim. Yes. Correct? Her claim is settled. It's not in the case. Yes, but I'm mentioning her as an example. It could be anybody. Let's say there was ‑‑ But the legal issues relating to her claim could be different, but how does that bear on his claim? Well, because, again, you're not getting to military or you could get to military operations. If I, as a civilian, filed a lawsuit, then I suppose if I wanted to allege products liability, I could get to their operations and their training, but I don't think you need to go there. You're simply saying a doctor doesn't make a whole lot of sense, really, is what you're saying, because you have two people who are precisely similarly situated, and because of his status, I mean, whether this is the case or not, it's clearly so that in some circumstances the military person is going to be able to assume we're going to be looking at this military discipline factor, even though you wouldn't for a civilian. Yes. I mean, it's a violation to be in the wrong lane, you know, on coming against oncoming traffic. I don't need to know your training. You're not supposed to be there, and I'm not doing anything wrong. But even if you did need to know, even if this was, if there was a products liability question in the case, you would still have the same anomaly. That is, the civilian still could sue and the non‑civilian couldn't, which means that it doesn't help very much in figuring out which is which, right? You would still have the same anomaly. You know, I just learned about this doctrine when I took this appeal, and it is baffling to me how we got from 28 U.S.C., 2680 J, combatants during a time of war, and I spend this weekend trying to figure out what's in that laundry bag. And I said, you know, oh, I know, there are sheets.  And that's how ‑‑ The point is simply that the anomaly point doesn't work very well because it's all anomaly. All things are anomaly. Could I just clarify some terminology? Your guy was on, quote, active duty, right? Well, you know, that term was bandied about, but then he explained it. His time was his own. He was on active duty. He wasn't on the clock. He wasn't, like, sitting in an office at that moment. But his status, his sort of official status was what they call active duty. Is that right or not? Yes. So the other things, furlough, liberty, a pass, all of those things are sort of like vacation, but you're still on active duty while you're on a furlough or a liberty or a pass. And he didn't have to report until the following Monday, so he was free to do what he wanted. This is actually a little different than a furlough or a pass because he actually had assigned things to do during this period. So he just could do it at his leisure, but he had to do it. Yes. So it wasn't really a equivalent to a recreational or vacation period. Yes. I have a few seconds. If I could make one point, I think if you look at the, you know, the case even shown to tell talks about the activities at the time of the accident, not in the future, not hours later, but at the time of the accident, he was using the road as any civilian would use it. And so I think that we should take a narrow construction rather than say what he was going to do sometime in the future or may not have done, and that the cases seem to support that. Thank you, counsel. Good morning. May it please the Court, I'm Lowell Sturgill from the Department of Justice representing the United States. We believe the district court correctly held that this case is controlled by the Callaway decision from this court. In Callaway, this court held that the Ferris Doctrine barred a cause of action where a service member was under orders to travel from one duty station in South Dakota to another duty station in Seattle, Washington. That service member was given six days in order to make the trip. He was injured in an auto accident in his own car, and we all know that it doesn't take six days to drive from South Dakota to Seattle, so he had some discretion similar to what Master Sergeant Geiger had here about exactly what to do and when to leave. He could have gone off and done something other than drive straight to the other location, yet Ferris barred the claim. The key consideration was the nature of the service member's activity at the time. He was on active duty. He was under orders. And the same considerations apply in this case. Could you define those terms, active duty? You can be off duty but on active duty? Yes. I'm sorry. Go ahead. Active duty means you're in the military and you're not discharged essentially. You're actively in service. You're a soldier. The courts have held that under that consideration, that makes one of the factors that leads the courts to suggest that Ferris will apply. If you're not on active duty, if you're discharged, it's pretty likely you're not going to be Ferris barred. But you can be on active duty and also be off duty or on a pass, on a furlough, at liberty, not under orders. All of those are consistent with still being on active duty. Yes. Is that right? Right. And it's significant that this person was not on furlough because in the Brooks case, the Supreme Court held that Ferris didn't par a claim when a person was on furlough or leave. Leave is basically communications. Is that basically how you would distinguish Schoenfeld? Schoenfeld, the key distinction was Schoenfeld was not engaged in any military purpose. He was not acting under orders. What he was doing was leaving the base to go take – This guy really wasn't under – it is different from Callaway in that he was not under orders to drive from his house to the base as such. He was under orders to get to the base at some point, not necessarily that day. But he really – Callaway, he was literally under orders to drive from A to B. Right? No. He wasn't under orders to drive. He could have taken a plane. Just however he wanted to get there. He had to show up. He had to show up. He had to show up or he had to – but he had – but he was given time specifically for the travel. So was Master Sergeant Geiger. Both were given more time than they needed to get their job done under which they were orders. But I guess the distinction is that the travel itself was not what was being assigned in this case. I don't think that makes a difference. The key is, was the person under orders? And here it's undisputed. And Master Sergeant Geiger himself testified that he was under orders to complete his in-processing. Yeah. What happens when a person – to be there. It's a fine-cut distinction, but these all are. But not under orders while he was getting there as directly. Again, I don't think that makes a difference. Because, again, what Sergeant Callaway was under orders to do was get to the base and to complete the training at the base. In fact, if you look at Callaway, the orders weren't to travel. The orders were – To show up at the other end. Right. To show up for military training in Seattle, however you want to get there. They didn't give him a plane ticket, so he had to figure out for himself how to get there, so he drove his own car. Similar in this case. And, in fact, the whole reason that Sergeant Geiger was making this trip was because the military didn't have room for him to have housing quarters on the base. There's a limited housing there, and he had to get housing off the base, which the military subsidized. So he then had to travel to the base because he couldn't live on the base. But, again, the point of doing that was he was completing his in-processing, which everybody has to do when you're assigned from one base to another. You have a checklist of things you have to carry out. You have to go see your commander. You have to get issued your battle fatigues. You have to check in with education, with finance. It's a long checklist of things you have to do. And I also want to note, I think, a very important thing. Lisa Geiger testified in this case that Sergeant Geiger had appointments that day. That's it. If I could give you the record, that's page 90 of the excerpts of record. So we know that he was going to the base to carry out those appointments, which he had on that day. And as has been mentioned before, Geiger himself testified that he was going to go to the base, even if he wasn't going to take his wife to, you know, for her appointment. His reason for going to the base was to finish his in-processing and to attend these appointments. Is there any pertinence that he was wearing his Army uniform? It is. Because I think it's... What are the rules about that? I mean, does an Army, somebody in the Army, have to be doing some Army-related thing to wear their uniform, or can they just wear it around? Well, the record doesn't show that he was required to wear the uniform to carry out the in-processing. But I'm told, and this is not in the record, that that's what a person naturally does. If you're going for a military trip... At a minimum, it shows a state of mind on his part. That's right. He was going to go see his superiors on the base. He had his dog tags on. He had his uniform on. I think this further confirms the fact that this case is fair as barred. And I think that this case is even actually a... So I think the first point is this case, the district court correctly held this case is controlled by Calloway. But this case actually is stronger than Calloway for two reasons. First of all, Calloway was injured in an automobile accident somewhere in the state of Montana, on a public road in his own car. Here, Sergeant Geiger was injured on the only road that leads to and from Fort Irwin. And this is a certified defense access highway, which means Congress has authorized the government to spend money to improve and repair and maintain this road, because it's the only way people can get to this very remote base, which is located... Here's a question about a mini fact. It wasn't clear to me whether there was the other road. When he testified, he did suggest there was another road. I think the best way to read that is that he said there's another way to get to Fort Irwin Road. There's various ways you could get from his house to Fort. But the record is clear that Fort Irwin Road is the only way you can get to the base. From the outside world to the base. Right. You can't get anywhere else on that road besides the base, or is everyone who's on that road going to the base? The record shows that there may be some what are called scattered residences. I take that to mean there may be a house or two somewhere out, you know, or maybe a hermit lives somewhere way out in the desert because they like being, you know, away from things. So there is that. I mean, you could have. But that would be, I think, completely anomalous just to make the case turn on that. And I would note also that in military hospitals, for example, we know that the Ferris Doctrine bars medical malpractice claims. But we also know that military hospitals serve not only service members but also civilian family members. So even in that kind of scenario, you can have the same kind of context where the Ferris Doctrine bars we know from Ferris. Military hospitals are owned and run by the military. This was a California road. Again, a certified defense access highway, and a stronger fact for the United States than in the Callaway case in which you applied, Ferris, because in Callaway, again, the injury happened in the middle of the state of Montana and not on any kind of certified defense access road. And the second thing, the second consideration that makes this case stronger than Callaway is the considerations of the possibility for second-guessing military judgments. As we have explained here in the brief. But that really does lead to ridiculous anomalies, right? It does. Because it means the same accident against two different people would lead to different results. I mean, the rest of it has something to do with whether the person who was injured is a military person. But if you start looking at the defendant's situation, you're going to come up with very silly results, even sillier. You know, I think the best I can tell you is if you look at the recent McConnell case from this court that the plaintiffs gave you, the court seemed to think that that kind of an analysis was significant, and their service member was injured in a boat accident. And the court said that one of the factors that made Ferris applicable was that the case could call into question the military's instructions to the service members about how to use the boat. And I think we're talking about the same sort of thing here. This case could result in the same kind of second-guessing and military judgments about, you know, how they instructed the service member. Was a non-military person going to be in that boat? I'm sorry? In McConnell, was a non-military person likely to be in that boat? Yeah, because military morale recreation and welfare facilities are open not only to soldiers, but also to civilian guests and family members. Nice. And I note also that in Callaway, the injury in Callaway occurred when a service member was rear-ended by another service member. And the plaintiff would say, I think that, well, you don't have to second-guess military judgments just to hear that case, because everybody knows you're not supposed to rear-end people. But yet that was significant enough. And the point is, in all these cases, is there a potential, is this the type of case that could lead to second-guessing of military judgments? And we think this one is the same way as Callaway and different from Schoenfeld. The last thing I want to say, I'm running out of time, is that although the Callaway case is an older case, it's been reaffirmed by this Court five times, and it's been cited by the other circuits. All of the other circuits which have addressed this fact pattern have applied fairness to this kind of case. So I think we would, again, ask the Court to affirm the district court, because you got it right. Callaway is controlling, and I've run out of time. Thank you, Counsel. Thank you. Ms. Bader, you used your time, but we'll restore a minute if you'd like to rebut. Okay. Quickly, insofar as Callaway, I've noted some differences in the briefs, and I just wanted to say this was a post-to-post situation. The driver was with other people, so it's not as if he could engage in a lot of other personal tasks. And travel for Geiger was not part of his job. The reason that he's in Barstow traveling in is because there was no in-house, no housing for him. So it's a different situation, whereas the other traveling was part of the situation. As far as having appointments, I believe that Geiger testified that he had no appointments that day, so even if there is some – I noticed that Lisa Marie Geiger was sometimes a little confused, that at least that creates a triable issue. But I don't think it's clear-cut that – I don't think he had any appointments that day. He said he didn't have to be there if he didn't want to. Thank you. Thank you, Counsel. The case just argued is submitted. We appreciate very much the arguments here.
judges: Graber, Berzon, Wilken